```
                                                    U.S. DISTRICT COURT
                                                    NORTHERN DISTRICT OF TEXAS
                                                           FILED

                                                        MAR - 3 2006
```
# United States District Court

                                                    CLERK, U.S. DISTRICT COURT
                                                    By_____
                                                              Deputy

_____NORTHERN_____ DISTRICT OF _____TEXAS_____

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

**APPLICATION AND AFFIDAVIT
FOR SEIZURE WARRANT**

**Up to $120,000.00 in funds contained in Account #XXXXXX9678 in the name of Steven E. Rosner at CitiBank F.S.B.**

CASE NUMBER: 3:06-MJ-87

I __Vincent Cantu__ being duly sworn depose and say:

I am a(n) __Special Agent with the Internal Revenue Service, CI__ and have reason to believe that in the Northern District of Texas there is now certain property which is subject to forfeiture to the United States, namely (Describe the property to be sized)

**Up to $120,000.00 in funds contained in Account #XXXXXX9678 in the name of Steven E. Rosner at CitiBank F.S.B.**

which is property subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(b) and 21 U.S.C. 881(a)(6) and/or 981(a)(1)(A) concerning violations of 21 U.S.C. §§ 841 and 846 and/or 18 U.S.C. §§ 1956 and/or 1957

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

See Attached affidavit.

Continued on the attached sheet and made a part hereof.    X Yes _ No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence
March 3, 2006 at 11:30 a.m.
Date

at __Dallas, Texas__
   City and State

Irma C. Ramirez
United States Magistrate Judge
**Name and Title of Judicial Officer**

_____
Signature of Judicial Officer

**AFFIDAVIT FOR SEIZURE WARRANT**

I, Vincent Cantu, having been duly sworn, do hereby state and depose as follows:

**INTRODUCTION**

1. I have been a Special Agent of the Internal Revenue Service, Criminal Investigation, ("IRS-CI") since July 1999. In that time, I have conducted numerous investigations of alleged criminal violations of the Internal Revenue laws (Title 26, United States Code); Money Laundering laws (Title 18, United States Code); the Bank Secrecy Act (Title 31, United States Code); and related offenses, including fraud crimes. From February 2000 through April 2002, I was assigned to the Drug Enforcement Administration/High Intensity Drug Trafficking Area (DEA/HIDTA) Task Force in Corpus Christi, Texas. I was also assigned to the South Texas Asset Forfeiture/Seizure Task Force from the fall 2000 through April 2002 in the Corpus Christi, Texas area. From May 2002 through December 2002, I was assigned to the IRS-CI HIDTA/Money Laundering group in the Dallas, Texas area. From January 2003 to the present time, I have been assigned to a general practices group in Fort Worth, Texas. I have received formal training in the financial investigation of narcotics traffickers and money launderers. I have also received formal training in tax investigations. In this regard, I have personally conducted numerous investigations of individuals and partnerships suspected of having evaded taxes, subscribing to false and fraudulent tax returns, and failing to file income tax returns.

1

2. I am a participant in this investigation and am thoroughly familiar with the information contained in this affidavit, either through my own investigation or through information received by me from IRS-CI, DEA, and other federal law enforcement agents and state and local law enforcement officers.

3. Based on my training and experience in conducting and participating in the investigations involving the large-scale trafficking of large amounts of controlled substances, I know that when controlled substances traffickers amass large proceeds from the sale or distribution of controlled substances, they attempt to legitimize these profits. To accomplish these goals, controlled substances traffickers utilize, including but not limited to, domestic and foreign banks and their attendant services (including accounts, certificates of deposits, inter-account transfers, wire transfers, etc.), securities, cashier's checks, money drafts, letters of credit, shell corporations, business fronts, and professional services to acquire and conceal proceeds and assets purchased with proceeds from controlled substances trafficking. More specifically, traffickers often establish financial accounts in names other than their own or their criminally involved businesses, including those of "dummy" or nominee corporations and companies as well as family members.

## PROPERTY FOR SEIZURE

4. This affidavit is submitted in support of an application for a seizure warrant for the following personal property:

(a)   Up to $120,000.00 in funds contained in Account #XXXXXX9678 in the name of Steven E. Rosner at CitiBank F.S.B.

2

## LEGAL AUTHORITY FOR SEIZURE

5. Based on my training, experience, and the information contained in this affidavit, I have probable cause to believe the personal property identified in paragraph 4 is subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 981(b) and 21 U.S.C. § 881(a)(6), respectively, because the property is the proceeds from the exchange of controlled substances and drugs in violation of 21 U.S.C. §§ 841, 842, 843, and 846. Additionally, based on my training, experience, and the information contained in this affidavit, I have probable cause to believe the personal property identified in paragraph 4 is subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 981(b) and 18 U.S.C. § 981(a)(1)(A), respectively, because the property was involved in or was property traceable to property involved in violations of 18 U.S.C. § 1956 and/or 1957. Additionally, 18 U.S.C. 984 provides that, in any forfeiture action in rem in which the subject property is funds deposited in an account in a financial institution, the government does not have to identify the exact funds involved in the offense that is the basis for the forfeiture; it is no defense that those funds have been removed and replaced by other funds; and identical funds found in the same account as the funds involved in the forfeiture offense are subject to forfeiture. In essence, § 984 allows the government to seize for civil forfeiture identical property found in the same place where the "guilty" property had been kept. However, § 984 does not allow the government to reach back in time for an unlimited period; a forfeiture action (including a seizure) against property not directly traceable to the offense that is the basis for the forfeiture cannot be commenced more than one (1) year from the date of the offense.

3

## PROBABLE CAUSE FOR SEIZURE

### A. Summary of Criminal Activity

6. This DEA investigation pertains to the acquisition, transportation, and sale of controlled substances distributed to drug-seeking individuals across the United States. This distribution is accomplished via Internet-based orders placed over websites not for a legitimate medical purpose and outside the scope of professional practice, as those ordering the drugs and the medical practitioners do not have a valid doctor-patient relationship. Specifically, Steve Rosner ("Rosner") and other known and unknown individuals were using the Internet to distribute controlled drugs and substances, including promethazine cough syrup with codeine (Schedule V controlled substance); alprazolam (Schedule IV controlled substance); hydrocodone (Schedule III controlled substance); diazepam (Schedule IV controlled substance) not for a legitimate medical purpose and outside the scope of professional practice, in violation of the 21 U.S.C. §§ 841(a)(1), 842(a)(2), 843(b), and 846.

7. The investigation also pertains to money laundering connected with the drug distribution scheme. Specifically, Rosner and other known and unknown individuals have engaged in financial transactions and monetary transactions involving property derived from specified unlawful activity in violation of 18 U.S.C. §§ 1956 & 1957.

## B. Summary of Investigation

8. In June 2004, the Fort Worth, Texas DEA office began an investigation regarding the drug-related activities of Johar Saran and his associates. In June 2004, the Texas Department of Food and Drug had advised Fort Worth DEA Diversion investigators that Saran operated several pharmacies in the Dallas/Fort Worth area and that Saran fraudulently ordered large amounts of non-controlled substances and medical equipment. Simultaneous to the DEA investigation, Federal Bureau of Investigation ("FBI") agents and the Food and Drug Administration ("FDA") Agents were investigating Saran for fraudulent purchases of wholesale quantities of drugs, pharmaceuticals, and medical equipment in violation of federal law. DEA Diversion investigators identified up to twenty-three (23) registered pharmacies in the Dallas/Fort Worth area controlled by Saran. These pharmacies were being operated under a parent company that was identified as Carrington HealthCare Services ("CHS"). This parent company name was later changed to Infiniti Services Group ("ISG"). DEA Diversion investigators determined that almost all of Saran's storefront pharmacies were located in industrial/warehouse strip centers, not consistent with the location of a legitimate retail pharmacy.

### Information from Confidential Informant

9. On February 26, 2005, a confidential informant ("CI") was interviewed by DEA Diversion Group Supervisor Joy Kusel and Diversion Investigator Dale Newkirk regarding his/her involvement with ISG. The CI advised that he/she posted a resume on www.careerbuilder.com, which apparently was subsequently observed by ISG General Manager David Kaiser ("Kaiser").

       The CI further stated that on February 23, 2005, the CI received an email and telephone call from Kaiser. The CI further stated that he/she was interviewed on February 23, 2005 by Kaiser and then by ISG's Chief Financial Officer (CFO), identified only as "Fred", at 1700 Tech Centre Parkway, Arlington, Texas. The CI said he/she had to wait for final approval of his/her hire by the Chief Executive Officer (CEO), identified by Kaiser and/or Word as "Joe Saran." The CI further stated that the Tech Centre Parkway location was very new and contained computers and fax machines but very little office furniture. The CI stated he/she was told the company (ISG) had just completed a move and was awaiting the delivery of office furniture. The CI also noted there were no certificates or licenses posted on any of the walls to verify the ISG employees were trained and certified to dispense pharmaceutical drugs.

10. The CI had worked as a pharmacy technician since 1999, but he/she indicated ISG did not seem to be interested in his/her work history. The CI did indicate ISG was interested in the CI's personality, the distance of the CI's residence from the business, and whether the CI was interested in working at an associated pharmacy. After being interviewed by the CEO Saran, the CI was provided with a walk-through of the facility. Saran also advised the CI that ISG was a "closed door pharmacy" involved in the filling of prescriptions for jails, prisons, and other correctional institutions. Saran also told the CI that Texas did not register closed door facilities and that was the reason for ISG's method of operation.

11. The CI further advised the DEA agents that the Tech Centre Parkway building contained three pharmacies: AMS, Triphasic, and an unknown pharmacy consisting of a large room containing shelves holding various

strengths of hydrocodone and pill-counting machines. The CI indicated that he/she noted most of the prescriptions were written by the same physician, Dr. Jose Rodriguez. The CI further advised the agents he/she observed a room at the Tech Centre Parkway location marked "shipping" that contained FEDEX envelopes and tables for packaging.

12. The CI further stated that after the tour, Saran hired him/her at a salary of $30,000 per year. The CI indicated he/she liked the relaxed atmosphere of the business (ISG) and believed that it might be an interesting place to work. According to the CI, he/she reported for work at ISG on February 24, 2005. The CI advised that he/she began working in a room with ISG employee "Heather" (believed to be Heather Elliott). The CI advised that the ISG pharmacist, Les Davidoff, was only present at the location for approximately two hours each day. When the CI asked Heather about the ISG pharmacist and how he/she could legitimately check so many prescriptions, Heather advised the CI that the pharmacist didn't check the prescriptions. The CI also stated he/she believed that Davidoff had another job because he showed up at the Tech Centre warehouse around 3:30 p.m. each day wearing a lab coat from another business.

13. The CI further explained to the agents that on February 25, 2005 he/she had lunch with an ISG team leader, identified as Cindy Roberts. According to the CI, Roberts downloaded prescriptions from 10-15 web sites. The CI further advised the agents that Roberts handled most of the web sites, was a most trusted employee, and had worked with Saran for three years. The CI further advised that all of the prescriptions he/she observed and/or filled were for hydrocodone and originated from web sites he/she identified as

7

"www.hydrocodone.com" and "www.orderhydrocodone.com"; most of these prescriptions were authorized and/or issued by Dr. Jose Rodriguez.

14. The CI further stated he/she complained while at ISG about counting pills without gloves or masks, indicating to agents the counting room was full of hydrocodone dust because so many pills were being counted in the room where he/she worked, adversely affecting the CI's asthma. Ultimately, the CI used his/her asthma condition as an excuse to resign his/her position. The CI also advised the agents he/she didn't want to work at ISG because he/she believed that the methods being used to dispense controlled drugs at the business were in violation of the law.

## Distribution Scheme

15. Based on the interview with the CI, interviews with other witnesses and informants, surveillance of various locations, examination of documents from "trash runs", and the monitoring of various court-authorized wire intercepts, the overall drug distribution scheme has been revealed. ISG has acted as an umbrella organization for approximately twenty-three (23) pharmacies registered as retail through the DEA during this investigation. The role of the ISG pharmacies has periodically changed throughout this investigation. These pharmacies, which have varied in number during this investigation, have at times acted solely as storefronts for the organization. Saran, by and through each of twenty-three (23) DEA registered retail pharmacies, has made numerous wholesale purchases of both prescription and pharmaceutical controlled substances from registered pharmaceutical companies at a significant reduction in cost. From at least February 2005 until the present, controlled substance and drug shipments have been received at Saran's various individual pharmacies and transported to ISG at

8

1700 Tech Centre #110, Arlington, Texas, a central processing area controlled and operated by Saran. At this location, the drugs and controlled substances were processed. The drugs and controlled substances were then illegally diverted to customers throughout the United States by various means, including on-line Internet orders and wholesale distribution to other drug distributors.

16. Concerning on-line Internet orders, ISG filled them for Internet Facilitation Centers ("IFCs"). Generally, the IFC charged the consumer by credit card, pay pal, cashiers check, money order, or cash on delivery ("COD"). Generally, the IFCs utilizing ISG to fill Internet drug orders have affiliated physicians that review patient history forms provided by the consumer through a drop-down menu at the drugstore website. These forms initially gave the appearance of a doctor-patient relationship. However, according to DEA Diversion Investigator Dale Newkirk, trash retrievals during this investigation from ISG's Tech Centre warehouse resulted in the seizure of date-stamped physician-approval documents which indicated the physician's review and approval of a drug order often took as little as two seconds to complete. This brief review process indicates the physician's approval was not thorough and would be considered insufficient.

17. Generally, the IFC paid the physician between $7.50 to $15.00 per review and approval. Once reviewed, the IFC caused an affiliated pharmacy to fill and process the drug orders. The affiliated pharmacy downloaded the drug orders and the drug users' names and addresses from a password-protected website under the IFC's control. The affiliated pharmacy filled the drug orders and shipped them by Federal Express ("FEDEX") or United Parcel Service ("UPS") to the drug user. The IFC paid the affiliated

9

pharmacy between $5.00 and $15.00 per order, plus the wholesale cost of the controlled substance. The IFC bore the cost of shipping by FEDEX and UPS through a third-party billing system. Shipping charges averaged approximately $20.00 per drug order. A ninety (90) dosage unit hydrocodone order cost the consumer up to $300.00 in this Internet scheme.

18. Though all the participants in this scheme profit, each processed drug order generally nets the respective IFC approximately $200.00, making the IFC by far the most profitable entity in the scheme. It is important to note that this scheme did not have a provision for the use of medical insurance. Rather, the drug user submitted a cash payment either by check, money order, credit card, or COD.

### Rosner's Involvement as an IFC

19. A review of Articles of Incorporation filed in Florida on April 18, 2003 indicate Rosner incorporated Heaven Sent Drug Services, Inc. and registered the corporation with a principal and mailing address of 2296 NW 62nd Drive, Boca Raton, Florida 33496. On July 1, 2004, Rosner changed the principal and mailing addresses of Heaven Sent Drug Services, Inc. to his residence address of 771 NE Marine Drive, Boca Raton, Florida.

20. A review of Articles of Incorporation filed in Florida indicates Rosner incorporated Moheba, Inc. on December 27, 2004, registering the corporate principal and mailing addresses at his residence, 771 NE Marine Drive, Boca Raton, Florida 33431. Pursuant to an administrative subpoena to Florida Power and Light Company, a review of records indicates the billing account for the 771 NE Marine Drive address is subscribed to by Steve

Rosner. Based on this information, I believe Rosner has consolidated his businesses at his residence and works from there.

21. Through Moheba, Inc., Rosner controls several websites including www.clickonmeds.com and www.offerpills.com. These websites allow Internet users to purchase prescription-type drugs and controlled substances by accepting orders for drugs and controlled substances from drug-seeking customers throughout the United States and bypassing traditional medical standards. These orders are processed, downloaded, and filled by employees of ISG. Once ISG processes and fills these internet orders, ISG ships these controlled drugs to the customers throughout the United States.

22. Moheba, Inc. operates as an IFC utilizing a scheme common among other IFC entities that ISG serves. The IFC facilitates transactions in which the general public uses the Internet to illegally purchase prescription drugs, including controlled substances, from websites. Moheba, Inc. effects the fulfillment of controlled drug orders in the following manner:

(a) The drug-seeking customer signs on the Internet and accesses the website www.clickonmeds.com or another website owned or controlled by Rosner.

(b) The drug-seeking customer selects a drug, and the website prompts the drug user to provide his/her medical history in the form of a questionnaire. The customer also selects and arranges for the type of payment for the purchase (credit card, COD, etc.).

(c) Rosner's IFC, by unknown means (possibly the internet) has a physician approval process in place for these orders. Several of the physicians' names appearing on the drug orders are based and

        reside in Puerto Rico. An "approval" by unknown means (possibly a viewing of questionnaires and/or a "rubber-stamp" process of attaching a physician's name) is granted prior to fulfillment. Telephone consultation between the drug-seeking customer and Rosner's employees (possessing unknown medical credentials and or medical experience) are also used in this approval process.

(d)    ISG is forwarded these drug orders, downloading the orders daily from the websites using access codes provided to ISG by Rosner.

(e)    ISG then fills the drug order and sends it to the "customer" via United Parcel Service ("UPS") or Federal Express ("FEDEX").

(f)    Rosner's IFC then pays ISG for the filled orders by bank wire transfer on a weekly basis.

23. By using the above-described Internet drug order and fill method, customers and on-line pharmacies completely bypass the acceptable American Medical Association practice of a valid doctor-patient relationship. The AMA guidelines require a personal examination by the prescribing physician, the retention of medical records acquired as a result of the exam and personal contact, and follow-up visits with the patient to assess the therapeutic outcome. In addition to the aforementioned AMA guidelines, the fulfillment of these drug orders acquired and conducted in this particular manner is illegal in the State of Texas.

<u>Court-authorized Title III Intercept</u>

24. On April 21, 2005, a Title III intercept order was signed by United States District Judge A. Joe Fish, authorizing the interception of electronic communications (full content) for a period of thirty (30) days to and from a digital transmission link. The digital transmission link (account

#000000000487001) is registered to Joe Saran, Fred Word, and David Kaiser at ISG, 1700 Tech Centre Parkway, Arlington, Texas 76014.

On May 24, 2005, a continuation of the T-III intercept was signed by Judge Fish, authorizing the continued interception of electronic communications (full content) for a period of thirty (30) days to and from the digital transmission link (account #000000000487001). On June 29, 2005, a continuation of the T-III intercept was again signed by Judge Fish, authorizing the continued interception of electronic communications (email only) for a period of thirty (30) days to and from the digital transmission link. The court-authorized intercept was concluded on July 27, 2005, and renewal was not sought.

25. During the court-authorized wire intercept, numerous intercepted electronic mails (email) reviewed by agents concerned Rosner's role in the drug distribution scheme. These emails are as follows:

   (a) On May 4, 2005 an e-mail was intercepted between ISG employee Heather Elliottt (Elliott), and Steve Rosner during which Elliottt sent a spread sheet to Rosner containing Moheba, Inc.'s weekly report for April 25, 2005 to April 29, 2005. This sheet also detailed the type, quantity, and cost of controlled and non-controlled substances that had been shipped to Rosner's customers by ISG. The spreadsheet was broken down for websites www.clickonmeds.com and www.offerpills.com and totaled $112,177.03. A review of Wells Fargo Bank, N.A. records concerning a Rosner-controlled bank account obtained by grand jury subpoena showed a wire transfer for $108,742.73 from Moheba, Inc. on May 4, 2005 to ISG; this transfer is believed to be payment for the above-referenced drug orders. In

13

subsequently intercepted emails, Elliott sent Rosner indicated there was a discrepancy between Rosner's and Elliott's records for the total "scripts" (drug orders) filled by ISG. In the emails, Elliott explained to Rosner the daily price of each type of drug changes and that is why there were "inconsisntes", believed to a misspelling of "inconsistencies." I believe this was the cause of the difference between the billed amount ($112,177.03) and the amount wired to ISG by Rosner ($108,742.73). This inconsistency was noted to have occurred in several payments made by Rosner to ISG during the course of the wire intercepts.

(b) On June 19, 2005, an e-mail between Rosner and Elliott was intercepted in which Rosner explained to Elliott "I will be sending you a little over 1900 order for you to ship tomorrow. Give me a call." By this statement, it is believed Rosner is telling Elliott he wanted ISG to ship over 1900 drug orders on his behalf.

(c) On June 21, 2005, an e-mail between Rosner and Janine.Terracciano@rbc.com, carbon copied to Elliott, asked Janine (known to be a RBC Centura Bank employee) to wire $110,304.88 to ISG. Review of wire transfer statements from Wells Fargo Bank N.A. indicate there was payment from Moheba, Inc. to ISG in the amount of $110,304.88. I believe this wire was a payment for drug orders (possibly the 1900) placed by Rosner to ISG on or about June 20, 2005.

(d) On June 29, 2005, an e-mail was intercepted between Rosner and Elliott that was later forwarded to Saran. In this email, Rosner informed Elliott of a large drug order for the period of June 20, 2005

14

to June 24, 2005. This order was from three websites, described by Rosner as "Click on meds", "Offer pills", and "New meds." Rosner also described the order by pharmacy fee, product cost, broker fee, and pharmacy cost; this week (for an entire week) was broken down by each website - $94,645.33 for "click on meds", $57,085.10 for "offer pills", and $5,319.30 for "new meds" – and totaled $157,049.33. A subsequently-acquired wire transfer statement from Wells Fargo Bank, N.A. indicated a wire transfer for $156,752.67 was sent to ISG from Moheba Limited, Bank of Cyprus. Records acquired by agents show Rosner is a signatory for the referenced Bank of Cyprus account. I believe this wire transfer was another payment from Rosner to ISG for filling and shipping illegal Internet drug orders.

<u>DEA Purchase of controlled substance from www.offerpills.com</u>

26. On July 5, 2005, DEA D/I Dale Newkirk, using the name of James Bartel, made an undercover controlled drug purchase through website www.offerpills.com, which is owned and controlled by Rosner. Newkirk logged on to www.offerpills.com and purchased ninety (90) caplets of Phendimetrazine (105 mg), a Schedule III controlled substance. Newkirk then provided the undercover name, a date of birth, and an e-mail address and indicated a preferred method of payment. After selecting Second Day/COD method of payment, he was then prompted to a patient information screen, which he completed and submitted. After Newkirk provided a billing address, he submitted the order.

27. On July 19, 2005, Newkirk received his undercover purchase from www.offerpills.com via UPS package. The following information was

15

printed on the shipping label of the package received by D/I Newkirk: "ORION (B08229002), 1126 S. Cedar Ridge #123, Duncanville, TX 75137 866-8053; RX # 3021317, DATE: 7/06/2005; Patient Name: James Bartel; DR: L. Torres DEA: BL7788271; Medication: Phendimetrazine 105mg-(90 pills) supply for 90 days; No refills; Discard after 07-14-2006; Directions: Take 1 before breakfast." During the order process, Newkirk never met with any physician, specifically Dr. L. Torres, and never discussed with any physician the medical history he provided. "Doctor L. Torres" has been identified as Doctor Maileen Lugo-Torres, with an address of Villa Auyerre, Calle Irma 133, San German, Puerto Rico 00683.

28. This undercover order represents a typical Internet drug order in which an anonymous individual can order and illegally receive a controlled substance, facilitated by an IFC (in this case, Rosner's). Based on this undercover buy, the DEA Dallas Field Division Diversion Unit has prepared an Immediate Suspension request for Dr. Lugo-Torres, expected to be served in conjunction with other enforcement operations in the near future.

<u>Trash Run at Rosner's residence</u>

29. On July 18, 2005, agents conducted a trash run at Rosner's residence, 771 NE Marine, Boca Raton, Florida. As stated previously, this address is listed as the primary address for Moheba, Inc. and Heaven Sent Drug Services, Inc. The trash run resulted in the discovery and seizure of assorted bills and documents that had been discarded. One of the items found was a copy of an e-mail from Rosner to Saran dated Sunday, April 17, 2005. In this e-mail, Rosner posted a report to Saran indicating that 1229 orders had been shipped by Saran for Rosner at a cost of $60,233.10. In the email, Rosner further indicated "the wire will be sent on Tuesday." A review of

16

the subpoena'ed Well Fargo Bank, N.A. wire transfer records revealed that a payment was made on April 19, 2005 to ISG from Moheba Inc. for $60,233.10. On September 1, 2005, an agent conducted another trash pull at the residence of Rosner. The agent found and seized a telephone bill in the name of Steve Rosner and other assorted documents, including a credit advice from RBC Centura Bank. The RBC document detailed the transfer of $5,000.00 from the Moheba account at RBC Centura Bank to a Citibank account in the name of Steve Rosner.

### Indictment Involving Rosner

30. On September 20, 2005, Rosner was indicted in the Northern District of Texas for conspiracy to commit health care fraud (18 U.S.C. § 1347), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and money laundering; conspiracy to possess and distribute a controlled substance (21 U.S.C. § 846); and money laundering in violation of 18 U.S.C. §§ 1956.

31. Specifically, in Counts 159 through 169, it is alleged Rosner "laundered" money with Saran and others in January 2005 through July 2005 by conducting wire transfers of various amounts from one of his bank accounts to an account in the name of Infinity Services Group, Inc. at Wells Fargo National Bank, Arlington, Texas. This account was identified as being at RBC Centura Bank in the name "Moheba Corp.", and the account number ended in the 4 digits 3831.

### C. Assets derived from and involved in the criminal activity

32. Information about Rosner's financial activities was obtained by grand jury subpoenas and through interviews with witnesses. It was determined Rosner maintains the following bank account in Florida:

17

  (a) Account #XXXXXX9678 in the name of Steven E. Rosner at CitiBank F.S.B. ("CitiBank 9678")

33. I have reviewed bank statements and associated records on this account.

34. Rosner opened this account on November 12, 2004 with a $43,016.45 transfer from a previous CitiBank account. The signature card shows Steven E. Rosner as the only signer on the account.

35. From the account's opening until June 30, 2005, deposits totaled $819,530.58. $120,000.00 of the deposits was wire transferred from the Moheba 3831 account at RBC Centura Bank (the account from which wire transfers were made to Infiniti Services Group).

36. The current balance in CitiBank 9678 is $143,244.17. The account is frozen by a restraining order issued in a separate civil cause concerning the health care fraud alleged in the indictment. However, according to bank sources, Rosner has inquired multiple times about the possibility of withdrawing the funds in CitiBank 9678.

## CONCLUSION

37. Based upon my training, experience, and the facts and circumstances set out in this Affidavit, there is probable cause to believe the property described in paragraph 4 constitutes the proceeds from a drug trafficking conspiracy in violation of 21 U.S.C. §§ 841 and 846 and/or was involved in a transaction or transactions in violation of U.S.C. §§ 1956 and/or 1957 or is property traceable to such property. Therefore, it is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(b) and 21 U.S.C. 881(a)(6) and/or 18 U.S.C. § 981(a)(1)(A), respectively. Therefore, I request the issuance of a seizure warrant for the property described in paragraph 4.

_____
Vincent Cantu
Special Agent, IRS-CI

SUBSCRIBED AND SWORN TO before me this 3rd day of March 2006.

_____
IRMA C. RAMIREZ
United States Magistrate Judge

19